# EXHIBIT B

11/30/2023 9:36 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 82127804
By: Wanda Chambers
Filed: 11/30/2023 9:36 PM

# 2023-83049 / Court: 113

NO.

| | | |
|---|---|---|
| **IN THE MATTER** | § | **IN THE DISTRICT COURT** |
| | § | |
| **OF** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **WILLIAM PERRY,** *Appellant* | § | **HARRIS COUNTY, TEXAS** |

## ORIGINAL PETITION APPEAL OF THE DECISION OF THE HARRIS COUNTY SHERIFF'S CIVIL SERVICE COMMISSION

**TO THE HONORABLE JUDGE OF SAID COURT**:

**NOW COMES** Appellant William Perry and files this *Original Petition Appeal* appealing the decision of the Harris County Sheriff's Civil Service Commission (Commission) in the case styled: *In the Matter of William Perry, Termination.*

### I.       *JURISDICTION AND VENUE*

District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by the Constitution or other law on some other court, tribunal, or administrative body. District Court judges shall have the power to issue writs necessary to enforce their jurisdiction. Tex. Const. Art. V, §8. Tex. Loc. Gov't Code§ 158.037 designates the District Court as the appellate court for appeals of the decision of the Harris County Civil Service Commission.

Venue is proper in Harris County, Texas. Tex. Civ. Prac. & Rem. Code Ann§ 15.002 (a).

### II.       *PARTIES AND SERVICE*

Appellant William Perry is a resident of Harris County, Texas.

Respondent Harris County Sheriff's Civil Service Commission may be served by and through the Director of Civil Service, Ms. Jutta Browder, 1310 Prairie, Ste. 680, Houston, Texas 77002, Telephone: (713) 755-7539, Fax: (713) 755-8990.

Respondent Harris County, Texas may be served by and through the Harris County Judge, the Honorable Lina Hidalgo, 1001 Preston, Suite #911, Houston, Texas 77002, Telephone: 713-755-4000, Fax: 713- 755-8379.

### III.    STANDARD OF REVIEW

The standard of review under Tex. Loc. Gov't Code§ 158.037(b) is the substantial evidence rule and adopts the standards found under Tex. Loc. Gov't Code § 158.0121(2), that states, "The Court shall reverse or remand the case for further proceedings if substantial rights of the petitioner have been prejudiced because the commission's findings, inferences, conclusions, or decisions are:

(A) in violation of a constitutional or statutory provision; (B) in excess of the commission's authority; (C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious, characterized by abuse of discretion, or clearly an unwarranted exercise of discretion."

A district court shall reverse or remand a case for further proceedings if (1) the commission committed one of the errors listed in section 158.0121 (listed above); (2) a substantial right of the petitioner was implicated; and (3) that right was prejudiced by the error." *Bexar Cnty. Civil Serv. Comm'n v. Casals*, 63 S.W.3d 57, 59 (Tex.App.-San Antonio 2001, no pet.), 63 S.W.3d at 60; *see also Parks v. Harris Cnty. Civil Serv. Comm'n*, 225 S.W.3d 246, 258 (Tex.App.-El Paso 2006, no pet.).

#### IV.    SUMMARY OF THE CASE

This action is an appeal of a Harris County Sheriff's Civil Service ruling to uphold the termination of William Perry. Mr. Perry's appeal centers on the lack of due process he was given at his Civil Service hearing when he was constrained by a one-hour time limit to refute forty-six allegations, each of which contained factual inaccuracies of purported policy violations. Due to the structure of a Civil Service hearing, Mr. Perry had a legal obligation to refute each allegation within that time period in order to win his hearing. Conversely, HCSO did not address each allegation forming the basis of just cause for Mr. Perry's termination and could rest on naked allegations containing factual errors to preserve their termination. Ultimately, HCSO has discovered a new strategy to abuse the Civil Service process and that is to create a plethora of factually inaccurate claims and then run out the clock of the hearing, hoping the sheer number of complaints is sufficient to carry the day. Mr. Perry's due process rights were violated, and he is asking the Court to exercise its duty to overturn Mr. Perry's termination and restore his loss of pay, benefits, and seniority.

#### V.    FACTS

William Perry was employed by the Harris County Sheriff's Office as a Human Resource Manager. He had been a Harris County employee since May 21, 2014. In a separate Civil Service action, Mr. Perry was reinstated to his employment as Human Resources Manager on January 18, 2023, based on a termination of employment on May 19, 2021. He was ordered to return to work and was awarded a backpay amount, that HCSO has never paid. The Harris County Sheriff's Office ("HCSO") mandamused the Civil Service Commission based on that ruling in a separate action. On May 11, 2023, Mr. Perry received notice from HCSO of a proposed disciplinary action of termination against him with an optional pre-disciplinary *Loudermill* meeting set for June 1, 2023.

After protests concerning the termination being conducted prior to HCSO bringing Mr. Perry back per Civil Service Order, Mr. Perry was reinstated but ordered to stay home with pay. Mr. Perry was not paid his correct hourly wage amount during this time. Mr. Perry waived appearing for the *Loudermill* meeting and a termination was instated on June 6, 2023. The termination outlines forty-six allegations of HCSO policy violations based on alleged conduct occurring prior to February 2021, based on a complaint filed by former Director Courtney Ball in December 2020. Mr. Perry timely appealed the decision to Civil Service and a hearing was set for November 1, 2023.

A hearing was conducted on November 1, 2023, before the Civil Service Commission. Both sides, Mr. Perry and HCSO, were informed that a time limit would be imposed on the hearing with each side having an hour each. The parties are timed based on when their representative is speaking or questioning witnesses. A representative for William Perry asked for a time extension. A ruling on the request was held until time was needed.

Each side submitted exhibits for the hearing and all were accepted. HCSO submitted fifteen exhibits. Mr. Perry submitted fifty-four exhibits. During the hearing, HCSO called five fact witnesses. Mr. Perry called three, including Mr. Perry. Mr. Perry was the last witness called and when he took the stand, he was told he had only eleven minutes left in his time. When time was exhausted, Mr. Perry's representative again asked for additional time and was granted five minutes. After the time expired and each side rested, Mr. Perry was granted two minutes in order to make a closing argument. After closing arguments, the Civil Service Commissioners retired to executive session.

The Commission returned from executive session and issued its ruling to uphold the Sheriff's Office termination of William Perry.

### VI.    ARGUMENT

1. **DISCIPLINARY ACTIONS ARE SUBJECT TO THE *JUST CAUSE* STANDARD**

Disciplinary actions within the Harris County Sheriff's Office are governed by the Harris County Sheriff's Civil Service Commission under the authority of Tex. Local Gov't Code §158.035(a)(5) (The commission shall adopt, publish, and enforce rules regarding: […] (5) disciplinary actions.). As part of its rulemaking power, the commission established the Harris County Sheriff's Office Civil Service Regulations, first adopted in 1982. In those regulations rule 12.0 states:

> "(a) No employee shall be subject to any disciplinary action **except for just cause**.
> (b) The cause for disciplinary action shall be in writing and shall particularly state the reason or reasons for which the Sheriff feels that disciplinary action is necessary.
> 1. Every employee receiving disciplinary action shall have presented to him a copy of just cause." (emphasis added).

The disciplinary letter given to Mr. Perry at his termination outlines the purported just cause claimed by HCSO and contained the forty-six allegations of wrongdoing. The Commission in rendering its decision "may only sustain, overturn, or reduce the disciplinary action." Sheriff Civil Service Regulations 12.04(i)(1) [regulations attached as Exhibit 1]. Just cause is not defined in the regulations but has the standard legal meaning.

The Commission, as a neutral party, must determine if HCSO showed it had just cause in its disciplinary action. The Commission can only uphold, overturn, or modify a discipline based on its weighing of the evidence presented. In this instance, they could only determine that termination was an excessive discipline measure given HCSO disciplinary standards as outlined in the HCSO disciplinary matrix. The HCSO disciplinary matrix is attached as Exhibit 2. The Commission is under the obligation to consider all the evidence before it when rendering its

decision and to determine if just cause existed; however, the time constraints it imposed made a consideration of all evidence an impossibility.

## 2.   ISSUES NOT ADDRESSED DUE TO TIME CONSTRAINTS

There were forty-six purported allegations of policy violations submitted by the Sheriff's Office to attempt to establish just cause for Mr. Perry's termination. To refute these allegations, Mr. Perry submitted fifty-four exhibits refuting the allegations. Given the time constraints and the length of executive session deliberation, it would have been impossible for the Commission to independently consider each exhibit as an alleged neutral decisionmaker. These allegations of purported misconduct involve workplace discrimination, insubordination, untruthfulness, and unacceptable supervisory conduct. Mr. Perry was only given an hour to present his case. With forty-six purported allegations, it was an impossibility to get through all the allegations. This was a specific and targeted strategy by the Sheriff's Office to subvert Mr. Perry's due process rights in order to unjustly terminate him after HCSO had previously lost at Civil Service against Mr. Perry.

A. Allegations of workplace discrimination

The disciplinary letter contained alleged violations of HCSO policy #202: workplace discrimination with four incidents of discrimination.[1] These allegations are based on employee statements of individual incidents dating from 2016 to 2019. No evidence was presented that Mr. Perry was ever counseled or disciplined for these purported allegations at the time of occurrence. Mr. Perry denied all the allegations. Workplace discrimination is not defined by HCSO policy but states "No employee of the Harris County Sheriff's Office (HCSO) shall discriminate against any employee or applicant for employment because of that person's race, color, religion, sex, sexual or gender orientation, national origin, age, disability, or veteran status with respect to

---

[1] All HCSO policies can be found online at https://hcsopolicy.com/

compensation, hiring, promotion, or other terms, conditions, or privileges of employment." HCSO policy #202. The U.S. Equal Employment Opportunity Commission ("EEOC") defines employment discrimination as unfair treatment of people in the workplace based on certain prejudices or protected characteristics. U.S. Equal Employment Opportunity Commission, What is Employment Discrimination?, https://www.eeoc.gov/youth/what-employment-discrimination (last visited November 28, 2023).

The first allegation concerning the pizza order of the department is based on the sworn statement of Carmen Amaya. There was no evidence besides Ms. Amaya's sworn statement to uphold this allegation. Mr. Perry did testify that pizza was ordered for office staff only prior to 2019 due to COVID restrictions. He testified that he would have ordered margarita pizza because there were two employees that were vegetarians that preferred it. He knew this based on their previous pizza orders. Ms. Amaya additionally stated that he insulted Ms. Syrenthia Bonds in the same comment. Ms. Bonds testified in the hearing that she did like to eat the meat lovers' pizza when they would order. Mr. Perry testified that he knew what they would like so he would have ordered it for them. He denies making hand gestures. Ms. Amaya was the assistant to Director Cortez prior to 2020 and Ms. Amaya was aware that she could go to the director with complaints about Mr. Perry, but she did not at any time.

The second allegation involved an incident with a temporary contract worker named Lagaylia Davis. Ms. Davis worked for HCSO last in 2019. Mr. Perry would have testified that he was unaware of the complaint that she made and that he was never notified. Ms. Davis was a contract worker that directly reported to HR Director Adela Cortez. If Director Cortez knew of the complaint, she would have had an obligation and duty under policy to address any allegations of harassment or discrimination. Mr. Perry would have presented Exhibit 18, HCSO Policy #202 to

show that if these allegations were made in 2019, then the Director was obligated to counsel or investigate these allegations.

The third allegation is that Mr. Perry mocked the accent of former HR Director Adela Cortez. Mr. Perry did testify regarding this allegation and stated that he would tell people what Ms. Cortez would say if she was here in a situation, but he denies that he ever mocked her. Ms. Cortez stated to Internal Affairs investigators that she did not hear Mr. Perry mock her accent. *See* HCSO Exhibit 2 Case Summary. This allegation would have occurred in 2018 to early 2020 when Ms. Cortez was employed by HCSO. These allegations were never acknowledged nor addressed at the time these employees stated they were offended nor were they reported.

The fourth allegation stems from the sworn statement of employee Lori Ridge who stated that she overheard Mr. Perry mock the accent of a Middle Eastern employee. Mr. Perry did testify that this was not true and that he did not mock the accent of the employee. There is no additional evidence to back up Ms. Ridge's allegation.

These allegations were brought concerning alleged incidents between 2016 to 2019. There was no evidence given to substantiate the claims. Mr. Perry would have shown that for the sworn statements made by the employees claiming workplace discrimination, that each employee made misstatements and false statements in their sworn statement for claims against Mr. Perry. Ms. Amaya was a direct report and assistant of former Director Cortez and Mr. Perry would testify that Ms. Amaya, had a reputation of telling Ms. Cortez about each employee and reporting supposed wrongdoings. If she had witnessed this conduct, she would have told Ms. Cortez at the time of the incident. Ms. Ridge makes several false statements in her sworn statement including claiming that Mr. Perry was untruthful regarding TWC hearings refuted by Exhibit 3 as outlined below. Paul Mendez, in his sworn statement, never provides factual evidence of discrimination or bias. Ronda

Plaskett stated in her statement numerous false allegations to include her example of Mr. Perry being banned from new hire orientations, which was easily refuted by emails presented by Mr. Perry. *See* Fourth allegation of untruthfulness pg. 16-17 below. By showing how each was wrong or untruthful in their false statements, Mr. Perry would demonstrate how the unsubstantiated statements that they made could not be taken as truthful. Mr. Perry would have additionally testified about his experience as an HR Manager and professional as well as his training on workplace discrimination. Based on his experience and knowledge, none of the allegations made against Mr. Perry as workplace discrimination violations met the established definition of workplace harassment in that none of the allegations established that Mr. Perry treated anyone negatively based on a protective class or that anyone was treated negatively or unfavorable based on being part of a protected class.

Given the complexity of these allegations and issues, it would not have been possible for Mr. Perry to address these allegations within the time constraints given and his due process rights were inhibited. Based on the evidence he would have presented, Mr. Perry would have been able to refute these allegations against him.

B.  Allegations of insubordination

HCSO alleged seven incidents of purported violations of HCSO policy #303: insubordination based on incidents in 2020 and 2021. Insubordination is defined in HCSO policy #303 as:

> "a. It is prohibited to willfully disobey any order lawfully issued by supervisory personnel or acting authority, or be disrespectful, mutinous, insolent, or direct abusive language toward any supervisory personnel or acting authority.
> b. Flouting the authority of any supervisory personnel or acting authority, by obvious disrespect or disputing orders, will likewise be deemed insubordination.
> c. An order is defined as any request, instruction, or command either implied or directed towards a subordinate by any supervisor or acting authority employed by the HCSO."

HCSO policy #303.

In the first allegation, HCSO alleged that Mr. Perry discussed confidential restructuring plans with another employee, Jocelyn Hatch in a conversation between Ms. Hatch, Mr. Perry, Mariel Rosario, and Syrenthia Bonds. To refute this allegation, Mr. Perry presented the statement of Ms. Rosario (Perry exhibit 47) who stated that Mr. Perry did not give confidential information in the conversation as well as HCSO exhibit 12, the statement of Veronica Weinberger who admits she spoke to Ms. Hatch about the restructuring. Mr. Perry also presented witness Syrenthia Bonds who was also present for the conversation and who testified that Mr. Perry did not tell them about the restructuring plans in the conversation as alleged by Ms. Hatch and Director Ball. Each piece of evidence sheds doubt on the truthfulness of the original allegation lodged by HR Director Courtney Ball that Mr. Perry was the source of information and directly refutes the statement presented by Jocelyn Hatch regarding hearing the information from Mr. Perry while in conversation with Ms. Rosario and Ms. Bonds. Further, Mr. Perry would have testified that the restructuring changes implemented by Director Ball were the same as restructuring changes planned by former HR Director Adela Cortez. Ms. Cortez had already disclosed to the office and Ms. Hatch. Mr. Perry would have also testified that Director Ball never stated that the information was confidential and when she confronted Mr. Perry about the issue in November 2020, Director Ball would not state what she considered to be confidential information. Mr. Perry was only told what Director Ball believed to be confidential when he received this disciplinary letter.

The second allegation is that Mr. Perry failed to provide Director Ball with a "Project Task List" as requested when she made requests for it in October 2020 and January 2021. If not for the time constraint, this allegation would have been refuted by Perry through Exhibits 9 and 10, both showing the delivery to Director Ball of the project task list in October 2020. Exhibit 9 specifically

shows that at Director Ball's request for the project task list in January 2021, Mr. Perry reforwarded the email sent to her in October 2020 with the project task list attached and included Director Ball's supervisor, Major Quincy Whittaker, on the email with a memo to Major Whittaker from Mr. Perry refuting Director Ball's complaints against his cooperation with Director Ball. Exhibit 10 is an email complaint Director Ball wrote to HCSO Internal Affairs complaining of not receiving the project task list which she had already received on a number of occasions based on the evidence. This exhibit demonstrates the untruthful actions and accounts Director Ball took in this investigation towards Mr. Perry and goes to cast doubt on other allegations she has made.

The third allegation is that Mr. Perry was insubordinate for failing to train employee Luz Serrano on court ordered expunctions in January 2021. To refute this, Mr. Perry would have presented Exhibit 1, a SWOT analysis presented to Director Ball in August 2020 that outlines each employees' scope of work. The document shows Ms. Serrano listed as primary for court ordered expunctions. Additionally, Mr. Perry would have presented Exhibit 13, the SOP for court ordered expunctions and planned to testify how the document was created by his subordinates, not him. This exhibit would additionally show, along with Mr. Perry's testimony, that Ms. Serrano had not been following the proper procedures for expunctions thereby creating the backlog that Ms. Serrano, through the insistence of Director Ball, blamed on Mr. Perry's negligence of not training her. Additionally, Mr. Perry would have presented exhibit 12 and 11, email chains regarding the training of Ms. Serrano where Ms. Serrano admits she was trained on expunctions by "Nikki," referring to Syrenthia Bonds, when she first started at HCSO. Exhibit 12 bates Perry 12-003. She stated in her sworn statement, submitted as HCSO exhibit 11, that she began working at HCSO HR in October 2019. Mr. Perry would have additionally testified that during the timeframe of this complained action, he was out of the office on approved FMLA leave in November and December

2020, and, following the first of the year, he was barred under order of being in the office due to the investigation that led to this termination. The expunctions that Ms. Serrano was failing to do, would have gone to HCSO HR Manager Veronica Weinberger or Director Ball to approve in the absence of Mr. Perry. Mr. Perry could not approve the expunctions virtually. The SOP, presented as Exhibit 13, states that either HR Manager Weinberger or Mr. Perry could approve expunctions as well as the HR Director. Though it may be true that Ms. Serrano was not preforming her job duties creating a backlog, HCSO would have failed to demonstrate how Mr. Perry was insubordinate in this allegation.

HCSO's fourth allegation of insubordination against Mr. Perry was that he did not delegate Texas Workforce Commission Hearings (TWC) to his subordinate, Ms. Lori Ridge. To refute this allegation, Mr. Perry would have presented Exhibit 1, a SWOT analysis presented to Director Ball in August 2020 that outlines each employees' scope of work. The document shows that Ms. Ridge was listed as the primary contact for TWC hearings. Mr. Perry would have additionally presented Exhibit 4, an email chain between Ms. Ridge and Ms. Lina Garcia of Harris County Office of Budget Management with Harris County Human Resources, a separate county department than HCSO. That email chain would show that Ms. Garcia referred TWC hearing questions and comments directly to Ms. Ridge in September 2020. Both these exhibits show that Ms. Ridge was known within and outside the department for being the point person for TWC hearings. Additionally, Ms. Ridge in her statement stated that she did hearings without Mr. Perry. HCSO exhibit 6. Given this information, HCSO would not be able to uphold its assertion that Mr. Perry did not delegate TWC hearing to Ms. Ridge and no evidence was presented that he acted in any way to prevent her from conducting hearings. Ms. Ridge additionally testified that she did conduct the hearings prior to Director Ball starting with HCSO.

The fifth allegation against Mr. Perry in regards to insubordination involved an employee who filed a grievance with Harris County regarding her job misclassification which resulted in her missing a pay raise designated for people in her job title. To refute this, Mr. Perry would have presented Exhibit 7, a handout created by Harris County Human Resources which outlined the steps to file a grievance and Mr. Perry would have testified that the employee in question had every right to file the grievance that she filed. He would have stated that the actions Director Ball and HCSO expected of Mr. Perry, to stop the employee from filing the grievance would have been an act against policy and possibly illegal. Mr. Perry would have additionally presented Exhibit 6, an email chain between Ms. Garcia and Director Ball that included Mr. Perry, which outlined Ms. Garcia's account of the grievance filed by the employee. Mr. Perry was one of two HR managers at HCSO at the time. The other HR Manager was Veronica Weinberger. Through Exhibit 1, the HR SWOT analysis, Mr. Perry would have demonstrated that Ms. Weinberger was directly over classifications and payroll, the two issues complained of in the employee grievance. The employee complained specifically of not receiving a response to her requests for reclassifications from HCSO HR and that she asked to meet with HR Manager Veronica Weinberger and former HR Director Adela Cortez. Ms. Weinberger testified that she was over classifications and payroll. Mr. Perry would have testified that he was aware of the problem because he knew that the employee had petitioned Ms. Weinberger and Ms. Cortez regarding the misclassification; however, he would not have access to the databases necessary to fix the issues, only Ms. Weinberger. Based on the evidence that would have been presented, HCSO would not be able to show that Mr. Perry was insubordinate in this allegation. Additionally, the allegation does not state an order or directive Mr. Perry did not follow. The conduct the employee grieved was outside his scope of employment.

The sixth allegation is that Mr. Perry failed to complete "the service awards project." This was based on a conversation Director Ball recorded on November 11, 2020, with Mr. Perry. Mr. Perry would have testified that the service awards project was behind because there had not been funds allocated for it in past budget cycles. This was known to Director Ball through previous conversations. Mr. Perry would have testified that in November 2020, the necessary money still had not been allocated. The project to update the files on service awards was delegated to Ms. Ridge and Ms. Bonds, who both testified that they were unable to complete the project or had difficulty completing the project. It would have been an impossibility for Mr. Perry to complete the project given the known budget constraints and the fact that Mr. Perry was out of the office most of November 2020 through February 2021. At home, he did not have access to the necessary files and equipment to complete the task. Given the totality of the evidence Mr. Perry would have presented, HCSO would not have been able to meet the just cause burden under this allegation.

The seventh and final allegation of insubordination was based on Mr. Perry not responding to the HCSO Internal Affairs Division Request for a statement as part of this investigation. Mr. Perry, through testimony, would have shown that this allegation does not fit in the definition of insubordination due to the fact that when the request was made, Mr. Perry was no longer employed with HCSO and was not obligated to follow orders given by the Internal Affairs division. This cannot be considered insubordination under the definition of policy and would not be an actionable discipline. Though HCSO Internal Affairs began in December 2020 and most of the witness statements were collected in January 2021, HCSO failed to bring Mr. Perry into to IA in order to allow him to make a statement only to complain after he had been terminated in May 2021.

If given the appropriate time, Mr. Perry would have been able to refute each allegation regarding insubordination that was alleged thereby negating HCSO's just cause. There is too much

evidence to parse through for these allegations for someone to establish the conclusions intended by the evidence and it was necessary for Mr. Perry to have more time to present the exhibits and explain them for him to fully exercise his due process rights.

C.  Allegations of untruthfulness

In its termination of Mr. Perry, HCSO alleged purported violations of HCSO policy #303, untruthfulness. HCSO purported six incidents of untruthfulness to demonstrate just cause for Mr. Perry's termination. HCSO policy #303 does not define untruthfulness nor does the policy use the work untruthfulness. The policy does bar dishonesty but dishonesty is not defined. Dishonesty is defined as "1. (Of a person) demonstrating a lack of integrity or probity; untrustworthy, and therefore tending to cheat people. 2. (Of documents, profits, etc.) fraudulent; resulting from a lack of candor, fairness, and straightforwardness. 3. (Of an action) not involving straightforward dealing; discreditable; underhanded; fraudulent." *DISHONEST*, Black's Law Dictionary (11th ed. 2019). Dishonesty and untruthfulness require a purposeful meaning to be deceitful instead of simply being wrong in fact or containing a different perspective.

The first incident of untruthfulness alleges that Mr. Perry was untruthful when he denied sharing confidential information with Ms. Hatch. This allegation was refuted above using Exhibit 47 and Exhibit 12 as well as through the testimony of Ms. Bonds. Additionally, Mr. Perry would testify that Director Ball did ask him if he shared confidential information with an employee. Director Ball could not or would not state what confidential information he supposedly shared. Mr. Perry did deny he disclosed confidential information, especially in light of not being told what information was confidential that was shared. Mr. Perry would have testified that he still did not share confidential information, which was backed up through the sworn statement of Ms. Rosario and the testimony of Ms. Bonds. The second allegation of untruthfulness is a reiteration of this

first allegation stating that Mr. Perry was again untruthful in denying he shared confidential information. Again, in that conversation, Director Ball would not say what confidential information was shared, giving Mr. Perry no way of knowing what he was being accused of. Additionally, Mr. Perry would have presented Exhibit 30, an email chain between Director Ball, Veronica Weinberger, and Mr. Perry where Director Ball wrote that she spoke to Ms. Hatch about the reorganization changes, the same information that HCSO now complains was confidential. Mr. Perry additionally would testify that he was never instructed by Director Ball that the restructuring plans were confidential though he did not share the plan with anyone; however, if Director Ball had said that to him, he would have told her that former Director Adela Cortez had previously disclosed that information to the office.

The third allegation of untruthfulness concerns the above-mentioned incident involving Luz Serrano and the old expunction files. Mr. Perry would have testified how he was not untruthful in his statements that he was not aware of Ms. Serrano's backlog. The issue centered on Ms. Serrano placing expunction files on top of a cabinet and not in the supervisor's inbox as required by the expunction SOP. Exhibit 13 Ms. Bonds additionally testified that expunctions were to be placed in the inbox for a manager's review or provided to the HR Director. Mr. Perry would have testified that the only way he can know if there is an expunction for his review would be for it to be placed in the inbox Ms. Serrano states that she repeatedly asked Mr. Perry about the files but there is no record of her emailing Mr. Perry regarding those files. Considering in the summer of 2020 many employees were working from home and Mr. Perry was working remotely from home from November 16, 2020 – January 3, 2021, returning to the office for three days and was remote again from January 7, 2021 – May of 2021, the only way she could have asked him about the files would have been to email him. Additionally, the files must be reviewed in person, Mr. Perry is not

the only person authorized to review the files and Ms. Serrano knew she could have asked Ms. Weinberger or Director Ball to approve the files to accomplish her workload. Mr. Perry would have additionally shown how Ms. Serrano herself was untruthful by stating that she needed Mr. Perry to train her on expunctions when she was trained in 2019 and had been completing expunctions since that time.

The fourth allegation of untruthfulness involved Mr. Perry conducting new hire benefit orientation for HCSO employees. Again, this allegation does not contain an act of untruthfulness; however, Mr. Perry would have presented Exhibit 39, an email chain where HR Manager Weinberger and former Director Cortez stated that Ms. Plaskett and Mr. Perry were to go and speak with new hires concerning their benefits. Mr. Perry did present in Exhibit 39 bates Perry 39-004, an email from Captain Ronny Taylor to Adela Cortez and Mr. Perry stating that Captain Taylor did order new detention officers to attend benefits orientation and that he did consider it mandatory. Ms. Plaskett testified that she was unaware of the email and that in her position as assistant and subordinate to Mr. Perry that she would not have been privy to the same information as Mr. Perry. Further, Mr. Perry would have presented Exhibit 23 to show the HCSO Benefits guide that is given to newly hired detention officers and is the material he was expected to teach to the new hire employees to demonstrate that based on his experience and the material to cover, that he believed the material required 3-4 hours to discuss and that Ms. Plaskett's opinion that it could have been done in an hour did not take into consideration the numerous complaints previously fielded by HCSO HR by confused newly hired employees who failed to properly sign up for benefits. This would have been bolstered by the email sent by Ms. Weinberger as Exhibit 39 stating that employees had complained. While Ms. Plaskett's stated to IAD that the onboarding benefits training was canceled by Director Cortez, there was no evidence of this occurring besides

the testimony of Ms. Plaskett. A directive such as the one referred to would have been documented. If given the necessary time, it would have been clear that HCSO cannot not uphold this allegation to just cause standards and the false testimony given by Ms. Plaskett in this incident, would have shown that her testimony as to Mr. Perry's character was doubtful.

The fifth allegation of untruthfulness against Mr. Perry involved the above-mentioned delegation of TWC hearings to Lori Ridge. It is alleged Mr. Perry was dishonest when he stated he had to be on the call per HRRM policy and that Ms. Ridge could not do the calls alone. To backup this claim, Director Ball submitted to IA an email to show this supposed false statement. That email is Exhibit 3. Mr. Perry would have presented Exhibit 3 to show that the claim made in the disciplinary letter misconstrued the email and is false. The email chain shows an exchange between Lina Garcia and Adela Cortez regarding TWC hearings with Adela requesting William "to start participating on these hearings. Please arrange with her to make appropriate changes to the process." Exhibit 3 at Perry – 03-002- 03-003. Director Ball also complains that Mr. Perry never made contact with Ms. Garcia concerning the hearings; however, in that same exhibit, Ms. Garcia states that she wanted to meet with Adela Cortez. Exhibit 3 at Perry – 03-001. Mr. Perry would have also presented Exhibit 54, a recorded virtual meeting between Ms. Garcia, Mr. Perry, Ms. Ridge, and other staff members. In that meeting, Ms. Garcia admits that she refused to schedule a meeting with Mr. Perry and his staff because she wanted to meet with Adela Cortez. This acknowledges that Mr. Perry and his staff made effort to meet with Ms. Garcia. Mr. Perry would have additionally testified that after Ms. Cortez's order to be present for TWC hearings, Mr. Perry or his staff were present for all hearings and there were no issues regarding the conducting of TWC hearings. He would have also testified that Ms. Ridge was trained on conducting TWC hearings but would ask for Mr. Perry to be present on complicated cases. Further, Mr. Perry would

have stated that he was not on vacation in September 2020 and that Director Ball is again misstating facts to fit her false narrative. The written documents directly refute this allegation and show that HCSO would not have been able to prove untruthfulness to meet just cause.

The sixth account under untruthfulness does not allege untruthfulness but states that Mr. Perry was incompetent thereby causing employee monetary loss. Mr. Perry would have testified to explain that there was an issue in 2020 with a switch to a new payroll accounting system called STARS. With the switch, employees coming back from extended leave were being billed for benefits that were not paid due to the employee running out of leave time. The issue was known as arrears. When the employee returned to work, the benefits owed to Harris County was automatically deducted from their first paycheck in full and every paycheck thereafter until the balance was paid. This left employees with $0 paychecks and caused complaints. HR Manager Veronica Weinberger was the head of payroll and assisted with the implementation of STARS. According to Exhibit 1, HR SWOT Analysis, Ms. Weinberger was the direct supervisor over payroll, compensation, STARS, and timekeeping. Exhibit 1, Perry 01-042. Ms. Weinberger acknowledges this in an email from March 2020 that would have been presented as Exhibit 35. Mr. Perry would have testified that he was not trained on STARS until November 2020 and did not have access to the databases that caused the error. Additionally, Mr. Perry would have presented Exhibit 21 and 22 to show that the issue with payroll errors creating loss with employees was a known issue being handled by Harris County Human Resources and the Harris County Auditor's Office. Exhibit 22, Perry 22-005. The email explains that previous to STARS Harris County HR, not HCSO HR would send billing statements to employees in arrears. That process was no longer continued with the implementation of STARS and issues were created that Harris County payroll and Harris County HR were trying to handle. Mr. Perry stated in an Exhibit 22

email that benefits team members were working with payroll to identify employees who would be affected and stated that no benefits employees have STARS employee beneficiary access. Exhibit 22, Perry 22-002. It was stated that only payroll employees would be able to identify effected employees and to fix any issues within the STARS system. Mr. Perry would have testified that this issue with the Arrears process was something HCSO payroll, under Veronica Weinberger, would have handled. He also would have testified that employees started complaining about the arrears issues not long after STARS was implemented in March 2020, which is confirmed by the email from Harris County Benefits at Exhibit 22-005. Nothing Mr. Perry could have done would have prevented the loss and he did not have the access necessary to fix the issue. Director Ball, who was never trained on STARS and did not understand the system, did not understand how the newly implemented STARS pay system worked. Mr. Perry would have also presented Exhibit 43, which is a memo presented to all employees who go on FMLA leave, a type of leave affected by the arrears issue. In that memo, HCSO states that an employee's immediate supervisor and timekeeper is responsible for the employee's payroll activity. Mr. Perry would have also testified that his job was to ensure an employee had access to benefits and he never had access to employee paychecks nor supplemental benefits elections. Though this allegation does not specifically allege untruthfulness, the account is easily refuted and HCSO would not have been able to show just cause for discipline.

D. Unacceptable Supervisory Conduct

HCSO alleged that Mr. Perry demonstrated unacceptable supervisory conduct as just cause for its termination. HCSO states policy #303, #305, and #307 were purportedly violated by Mr. Perry in how he conducted himself as a supervisor but does not cite specific provisions in those policies. The specific instances of conduct prohibited date from 2015 to 2020. If given the

appropriate amount of time, Mr. Perry would have been able to refute these allegations negating HCSO's just cause for termination.

The first allegation under unacceptable supervisory conduct was an account by Carmen Amaya stating that Mr. Perry was rude to her when she was first hired. Ms. Amaya was hired in 2016 and it assumed this allegation is from 2016, though the first time this was brought up to Mr. Perry's attention was when he was presented with this termination in 2023. Mr. Perry would have testified that he never said this statement to Ms. Amaya and he does not believe that Ms. Amaya was ever under his supervisory authority. Ms. Amaya was not able to give solid accounts nor witnesses of her allegations and offered hearsay statements. Mr. Perry would have testified as an example to Ms. Amaya's falsehood her account of Mr. Perry touching the top of his head and about dating a woman who was a size 0 or 2. Those examples were from a training session on sexual harassment in the workplace all HCSO employees were encouraged to attend. Mr. Perry would have presented Exhibit 40-003 to show a roll call he gave to staff concerning sexual harassment training. The training was put on by Mr. Perry and County Attorney Eileen Begley. Those were both examples used in the training of coworker comments that Mr. Perry read from the training script.

In the second allegation, Ms. Ridge states that she felt disrespected and degraded due to a comment made by Mr. Perry in June 2020. Mr. Perry would have testified and Ms. Syrenthia Bonds testified that the statement "it's so easy a clerk could do it" was something that was commonly stated by former Director Adela Cortez. Ms. Ridge in her statement to IA specifically stated that Mr. Perry was stating that Ms. Cortez said the project was so easy a clerk could do it. HCSO Exhibit 6. Ms. Ridge testified in the hearing that she was assigned to complete this project. Ms. Ridge also testified that the Project Task List showed the projects she was assigned in Fall

2020 and she stated that none of the projects she was the lead on were completed. *See* Exhibit 9, Perry 09-009. Mr. Perry would have stated that he made the comment as quoting Ms. Cortez who specifically said the project Ms. Ridge was assigned was so easy a clerk could do it; however, he did not believe it was and he knew it was very involved. It is clear from the record that Mr. Perry is being punished for a comment commonly made by former HR Director Adela Cortez and HCSO cannot maintain just cause for this allegation.

The third allegation is that he emailed Ms. Guzman with an email stating "please follow up." This email was submitted by Ms. Guzman as part of the investigation and is Exhibit 20. What is clear from this email chain is the initial email was sent by Ms. Guzman with the subject line "Please follow up." Exhibit 20, 20-002.  It was Ms. Guzman who typed "please follow up" to Mr. Perry. The chain contains Mr. Perry's response where it is clear that he attempted to assist her and responded to her requests within minutes after his assigned work hours. In no way does the email state that Mr. Perry asked Ms. Guzman to do his job or ignored her inquiry. This allegation is easily disproven by the evidence Mr. Perry sought to present. It works to call into doubt all other allegations made by Ms. Guzman towards Mr. Perry.

The fourth allegation is from Ms. Ridge that Mr. Perry stated that he could not stand a set of HR employees. Mr. Perry would have testified that he did not make these comments. The three employees were not subordinates that reported to Mr. Perry and were not ones that Mr. Perry commonly interacted with. Mr. Perry would have pointed out the other falsehoods in Ms. Ridge's statement, to include when she stated that Mr. Perry yelled at Luz Serrano; however, in Ms. Serrano's statement, she stated that Mr. Perry was not loud and did not yell at her during the meeting. Mr. Perry has also presented evidence that Ms. Ridge made false statements concerning the TWC hearings and her involvement with the service awards, as stated above. This information

puts into doubt any unsubstantiated statements made by Ms. Ridge. Ms. Ridge statement at HCSO exhibit 6 and Ms. Serrano's statement at HCSO Exhibit 11.

The fifth allegation is from the complaint made by Director Ball that Mr. Perry yelled and threatened payroll clerk Mary Ann Morehouse. Ms. Morehouse testified in the termination hearing that the account made by Director Ball was false and the encounter as stated in termination paperwork was false and an inaccurate account of what actually occurred. Additionally, Ms. Syrenthia Bonds, who witnessed the interaction testified that Director Ball's allegation and account of the event was false. This allegation was thoroughly disproven through live witness testimony during the hearing.

The sixth allegation involves an incident with Luz Serrano where Mr. Perry addressed complaints made against Ms. Serrano. Ms. Ridge stated that Mr. Perry yelled at Ms. Serrano but that was disputed by Ms. Serrano, who did not think Mr. Perry yelled at her. Mr. Perry would have testified that he did not state that he "was going to have to write you up" and what he stated was to all the employees that Director Ball had ordered the Managers to start documenting and "writing up" employees that made errors. He did ask to speak to Ms. Serrano privately. Ms. Serrano stated that witnesses were present and the whole office could hear him state it but no one else could substantiate the claim. The meeting was about verification of employment letters for former employees. They are only done for former employees. Ms. Serrano had made several errors with these letters, specifically getting the letters mixed up and giving letters and protected employee information, to include their payrate, to the wrong person. Mr. Perry would have testified that he did counsel her on the error and stressed the importance of making sure protected or confidential employee information is handled properly. This is addressed within a day of the issue coming to Mr. Perry's attention. Ms. Serrano was not written up but she was reminded that Director Ball

instructed for more writeups to be done and was told that if something like this happened again, she would be written up.

The seventh allegation is by Mr. Paul Mendez stating that Mr. Perry publicly threatened to write him up. Mr. Mendez testified that he was a direct report employee to Mr. Perry and that Mr. Perry could write him up. He additionally testified that he was in fact written up by Director Ball and not Mr. Perry. Though Mr. Mendez states that he was publicly threatened, there is no substantiating account for his statement. Mr. Perry would testify that he did not threaten to write up Mr. Mendez. Everyone in the office was told by Director Ball when she first on boarded that write ups would increase and pressured the HR Managers, to include Mr. Perry to enforce her directives.

The eighth allegation is from Ms. Ridge who stated that she was intimidated by comments made by Mr. Perry concerning meetings with Director Ball. Mr. Perry denies that the conversation occurred. The allegation additionally states that Director Ball spoke with Mr. Perry about the intimidating comment; however, Mr. Perry would have testified that in the audio recording given to IA by Director Ball of this conversation, Director Ball would not give specifics on what comment Mr. Perry had supposedly made and since she would not tell him what he supposedly said and when, he did not speak further on the issue. It has been discussed above how Ms. Ridge and Director Ball have made proven false reports in their statements to HCSO and those falsehoods go to the weight of this allegation, which Mr. Perry would have denied.

The ninth allegation regarded instances where Mr. Perry supposedly called Ms. Ridge "Helpful Helen." Mr. Perry testified that he did not refer Ms. Ridge this nickname. He would have testified that he did deny her request to assist other employees with their work and he explained to her that she could not volunteer to help other employees until she had finished her own work and

tasks. Ms. Ridge did testify that she had not completed the projects assigned to her in the project task list as explained above. *See* Exhibit 9, Perry 09-009-09-010.

The tenth allegation regarded an accusation by Ms. Ridge that Mr. Perry called an employee "Moses" because she was slow. Mr. Perry testified that he did not call anyone Moses. There is no evidence to back up Ms. Ridge's claim and it has been shown that Ms. Ridge has made errors and falsehoods in her statement to IA.

The eleventh allegation was an accusation that Mr. Perry stated, "you have to be smart to do that," referring to a portion of STARS training. Jocelyn Hatch said in her statement that Mr. Perry directed the comment towards Mariel Rosario; however, Ms. Rosario testified that she heard the comment but did not believe it was directed at her. Ms. Hatch statement HCSO Exhibit 9; Ms. Rosario's statement HCSO Exhibit 8. Mr. Perry would have testified that he was at the STARS training as referenced in this complaint. He would have explained that STARS was a very complicated and cumbersome. He would have stated that he recalls making the statement in reference to a complicated procedure they were being taught but he did not direct the comment towards anyone or about anyone.

The twelfth allegation was again an accusation from Ms. Ridge that Mr. Perry allegedly made cryptic comments about command staff and that he was irreplaceable. Mr. Perry would have testified that he did not make these comments, especially to a subordinate. There is no evidence to back up this claim by Ms. Ridge.

The thirteenth allegation was an accusation by Ms. Amaya that Mr. Perry complained that there was too much work and not enough resources in HR and blamed then Chief Deputy Toquica. Mr. Perry would have testified that he does not recall this conversation and did not make these comments. Mr. Mendez in allegation fourteen could not state specifics but stated that Mr. Perry

would speak negatively when he did not agree with a command decision. In allegation fifteen, Director Ball stated that she asked Mr. Perry if he was making comments concerning disproval of supervisory directives to subordinates but she would not give specifics. Mr. Perry would testify that in the audio recording provided to IA by Director Ball that he stated that he would need specifics on any allegations before he could answer to them.

The sixteenth allegation against Mr. Perry concerned an interaction between Ms. Amaya and a newly hired employee. Mr. Perry would have testified that this allegation did not make sense given that the shirts given to new hires for ID pictures were in a room within the HR office for newly hired employees to select a shirt and get dressed so there would have been no reason for Ms. Amaya to select a shirt for an employee. Mr. Perry would have additionally stated that he did not recall this interaction and would not have made such a statement.

Allegations seventeen through twenty-seven lists several employee's opinions of Mr. Perry that were given through IA statements. Each employee was asked by IA if Mr. Perry created a hostile work environment and only one employee, Ms. Ridge, was cited in the letter as stating that Mr. Perry created a hostile work environment. All of these statements were the opinions of employees and none of these concerns were ever addressed with Mr. Perry considering some of these allegations are from as far back as 2015 and 2016. Mr. Perry would have testified to each of these as a whole that each employee was fed the words intimidating and controlling during the IA interview process. Mr. Perry would have testified how these employee opinions on his personality were never addressed with him from 2015 to 2020 through two previous directors and if the Sheriff's Office had issues with his tone and demeanor during that time, then that should have been addressed at the time of the incident as stated in HCSO policy. Most of the opinions in this section were not presented with concrete examples of actions and those that were have been refuted above.

Many of these opinions were separated from the examples given and listed in either other parts of the disciplinary letter (and addressed above) or were not found credible and not listed in the disciplinary letter, only leaving a baseless opinion. Mr. Perry would have addressed all concrete examples but would have lumped the opinions given together to refute as a whole.

In allegation seventeen, Ms. Weinberger complained that Mr. Perry told employees that IA statements are given to the employee subject to investigation and that Ms. Weinberger believed that was an intimidation tactic. She used this example to show that Mr. Perry could be intimidating. Mr. Perry would have testified that what Ms. Weinberger was referring to was a roll call meeting where all employees were told about IA procedure and civil service. He explained to employees that if an employee is disciplined, then that employee would eventually be given the IA file to include all witness statements as part of a civil service appeal and if the employee was not disciplined, then the file is not subject to disclosure. This meeting was done after employees called HR worried about going to IA to make witness statements and the person speaking to them did not know IA procedure or civil service rules. This was an information session and Mr. Perry believes this meeting happened prior to 2019. This was the only example given by Ms. Weinberger to uphold her opinion the Mr. Perry was controlling and intimidating but she failed to give the context of the discussion in order to serve her own agenda.

In allegation twenty-four, employee Rachel Martinez used as an example that Mr. Perry was a poor supervisor because he would have meetings to discuss issues instead of sending emails. Mr. Perry would have testified that when there were issues that came up, roll call meetings were required under previous directors and he had to documents these meetings. He would have further stated that there were many examples in the exhibits where Mr. Perry sent emails to staff. Despite

this fact, whether the HR manager sends emails or has roll call meetings is not a policy violation and is not an appropriate example of Mr. Perry unacceptable supervisory conduct.

Allegation twenty-five was brought by employee Melva Shorter. Ms. Shorter stated that Mr. Perry gossiped but Mr. Perry would have testified that she did not provide an example and could not answer to this allegation. Mr. Perry would have testified that Ms. Shorter was not one of his subordinates and he had limited interactions with her. He was aware of her complaint about not receiving help for her work. Ms. Shorter, who works for Ms. Weinberger, fell behind in her duties as an analyst when a second analyst position was eliminated by former Director Adela Cortez under the belief that there was only enough work for one analyst. She asked for people to help her get caught up. Ms. Weinberger did not offer any help from her team, which Ms. Shorter was in. Mr. Perry, as the manager of his team, would not authorize other personnel to help unless they were caught up with their own work. As addressed previously, Ms. Ridge wanted to help Ms. Shorter with her work. Ms. Shorter, as an analyst, was in a higher paying position than Ms. Ridge. Ms. Ridge wanted to go into that position. Mr. Perry would have testified that he told Ms. Ridge he was happy for her to learn other skills, but she needed to first do the work she was assigned. As stated previously, Ms. Ridge testified that she had not completed her assignments as outlined on the project task list. Mr. Perry was aware that Ms. Shorter was upset that Ms. Ridge was not allowed to help her, but he could not let that influence his managerial decision to have Ms. Ridge complete her assignments. Mr. Perry would have additionally testified that employees Ms. Ridge was assigned to do tasks with would often complain to him that Ms. Ridge would get caught up in doing other tasks outside her job, such as helping with filing and leave the bulk of her work to other people. Mr. Perry attempted to address this with Ms. Ridge and laid down rules and standards for her own work through his role as her supervisor.

The twenty-eighth allegation against Mr. Perry stated that he made detention officers cry when they were in his office. This accusation was brought by Ronda Plaskett. It is similar to the allegation made by Luz Serrano in allegation twenty-three. Mr. Perry would have testified that he has experienced employees cry in his office. He often has employees come to him to talk about traumatic life crises. These are not employees that direct report to him but they are HCSO employees coming to HR for help. He recalls a detention officer crying in his office after learning of a cancer diagnosis. Mr. Perry would have pointed out that if he had made employees cry because of how he spoke to them, the employees would have complained and that would have been documented. There were no such complaints. Mr. Perry would have additionally testified that Ms. Plaskett and Ms. Serrano's work area was very far away from his office so they would have had no reason to be near his office during these meetings. Mr. Perry prided himself for creating a safe place for employees to speak about their issues. Mr. Perry would have testified that Mr. Plaskett was wrong about the reason employees would sometimes cry in his office much like she was wrong about the new employee orientation. Both Ms. Plaskett and Ms. Serrano were taking an incident out of context without learning all the facts. They did not have all the information before coming to a negative conclusion.

The twenty-ninth allegation against Mr. Perry stems from Harris County HR employees stating that Mr. Perry was difficult to work with. Erika Owens complained that Mr. Perry disturbed orientation classes and that she complained to former Director Adela Cortez in 2018. Mr. Perry would have presented Exhibit 28 Bates Perry 28-006 to show that he received permission to address HCSO employees at the Harris County retirement seminar from Harris County HR in 2017. This was based on an original request by Harris County Human Resources due to the fact that HCSO personnel have specialized retirement considerations that were not being addressed in

the countywide seminar. Mr. Perry met with employees informally at a table and did not speak during the seminar. There were many people at tables to include insurance vendors, health vendors, and the social security agency who were all speaking with employees at the same time. He would have also presented Exhibit 44 which was his information packet that he used during these orientations. Mr. Perry would have testified that he spoke during the break and met with people after the seminar. Mr. Perry would have presented Exhibit 28 Bates Perry 28-009 – 28-010 as an example of the praise he received from the employees regarding his involvement. Mr. Perry would have testified that in 2018, the issue was addressed by Director Cortez. Ms. Cortez even called the vendor that sat next to Mr. Perry who stated that Mr. Perry was not loud or disruptive, refuting Ms. Owens account. Additionally, Mr. Perry showed Ms. Cortez that Ms. Owens did not attend the retirement seminars and was not writing based on first-hand knowledge. Ms. Cortez chose not to take any action at the time and did not find a policy violation. Director Cortez had the ability to reprimand Mr. Perry and chose not to in 2018 based on the totality of the circumstances, especially given that the email sent by Ms. Owen in 2018 complains of actions Mr. Perry supposedly did in 2016 and 2017. *See* Exhibit 28 Bates 28-001. Ms. Garcia and Ms. Owens could not present an example of issues with Mr. Perry that were within the last year of the investigation and they both stated that they brought their concerns to Mr. Perry's supervisor to handle at the time. HCSO HR employees and Harris County HR employees are in separate departments within Harris County and cannot assert supervisory control over each other. These allegations do not encompass violations of policy #307 and based on the totality of the evidence, HCSO would not have been able to uphold just cause for the termination.

Given the appropriate time, Mr. Perry would have also questioned the weight of the allegations when the employee statements given used examples of impropriety that are easily

refuted by hard evidence such as emails. Mr. Perry would have also testified that there are blatant inconsistencies within the statements themselves where employees complained Mr. Perry was controlling but also complained that Mr. Perry was not available to help them with their work thereby causing them to not meet expectations on work performance. With all this information, the civil service commission would have been able to properly weigh the evidence and determine whether Mr. Perry's civil service rights were followed and whether HCSO followed its own policies and protocols. Mr. Perry would have shown ample evidence to dispute the just cause of HCSO in all counts and his termination should have been reversed.

D.  LEGAL STANDARD FOR CIVIL SERVICE APPEAL

The District Court may reverse a finding of the Civil Service Commission if the Appellant can show that his substantial rights have been prejudiced by the Civil Service Commission because the ruling is  A) a violation of a constitutional or statutory provision, B) in excess of the agency's statutory authority, C) made through unlawful procedure, D) affected by other error of law, E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole, or F) the ruling is arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion based on Tex. Gov't Code §2001.174(2) A-F.

This standard of review is also known as the substantial-evidence standard. Tex. Loc. Gov't Code § 158.037; *Bexar Cnty. Civil Serv. Comm'n v. Casals*, 63 S.W.3d 57, 59 (Tex.App.-San Antonio 2001, no pet.)("A decision by a civil-service commission is subject to the substantial-evidence rule."); *Woychesin v. Harris Cty. Sheriff's Civil Serv. Comm'n*, No. 14-11-00304-CV, 2012 WL 3776359, at *2 (Tex. App. Aug. 30, 2012). A district court shall reverse if (1) the commission committed one of the errors listed in section 158.0121 (listed above); (2) a substantial

right of the petitioner was implicated; and (3) that right was prejudiced by the error." *Casals*, 63 S.W.3d at 60; *see also Parks v. Harris Cnty. Civil Serv. Comm'n*, 225 S.W.3d 246, 258 (Tex.App.-El Paso 2006, no pet.).

The substantial-evidence standard is a rational-basis test to determine, as a matter of law, whether an agency's order is reasonably supported by record. *Employees Ret. Sys. of Tex. v. Garcia*, 454 S.W.3d 121, 132 (Tex. App.–Austin 2014, pet. denied) (citing *Texas Health Facilities Comm'n v. Charter Med.–Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984)). "The true test is not whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the action taken by the agency." *Charter Med.–Dallas*, 665 S.W.2d at 452. The reviewing court presumes that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence, and the party challenging the order has the burden to show otherwise. *Slay v. Texas Comm'n on Envtl. Quality*, 351 S.W.3d 532, 549 (Tex. App.–Austin 2011, pet. denied).

"Substantial-evidence analysis entails two inquiries: (1) whether the agency made findings of underlying facts that logically support the ultimate facts and legal conclusions establishing the legal authority for the agency's decision or action and, in turn, (2) whether the findings of underlying fact are reasonably supported by evidence." *See Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co.*, 416 S.W.3d 11, 26–27 (Tex. App.–Austin 2013, no pet.) (citing *Charter Med.–Dallas*, 665 S.W.2d at 453); *Texas State Bd. of Pharmacy v. Seely*, 764 S.W.2d 806, 813 (Tex. App.–Austin 1988, writ denied); quoted in *R.P. v. Texas Dep't of Family & Protective Servs.*, No. 03-16-00308-CV, 2017 WL 160912, at *3 (Tex. App.—Austin Jan. 13, 2017).

The first inquiry is concerned with the extent that the underlying facts held by the Civil Service Commission logically support the decision rendered by the hearing. This may involve questions of law that are reviewed *de novo*. *Garcia*, 454 S.W.3d at 132.

The second inquiry is the core of the substantial-evidence standard and is concerned with "whether the findings of underlying fact are reasonable supported by evidence. This analysis is highly deferential to the agency's determination." *Garcia*, 454 S.W.3d at 132. The substantial-evidence analysis "'does not mean a large or considerable amount of evidence'—in fact, the evidence may even preponderate against the agency's finding—but requires only 'such relevant evidence as a reasonable mind might accept as adequate to support a [finding] of fact.'" *Id.*; quoted in *Texas Dep't of Family & Protective Servs.*, 2017 WL at *3. Additionally, the reviewing court "may not substitute its judgment for the judgment of the State agency on the weight of the evidence committed to agency discretion." Tex. Gov't Code §2001.174.

Substantial evidence is more than a scintilla of evidence but less than preponderance and the evidence "may actually preponderate against the decision and still amount to substantial evidence." *City of Houston v. Anderson*, 841 S.W.2d 449, 451 (Tex.App.—Houston [1st Dist.] 1992, writ denied); *City of Rice v. Texas Comm'n on Law Enf't Officer Standards & Educ.*, No. 03-11-00047-CV, 2013 WL 3186194, at *2 (Tex. App. June 21, 2013) quoting *Board of Law Exam'rs v. Coulson*, 48 S.W.3d 841, 844 (Tex. App.-Austin 2001, pet. denied). "The appeal court is concerned with the reasonableness of the administrative order, not its correctness" and if reasonable minds could have reached the conclusion that the agency reached, the appeals court will uphold the decision. *Id.*; *See State v. Public Util. Comm'n*, 883 S.W.2d 190, 203 (Tex.1994).

In this case, the Appellant complains that in its ruling the Civil Service Commission was in violation of a constitutional or statutory provision. Civil Service regulation 1.03 states "[n]othing in these rules shall be so construed as to be in conflict with the laws of the State of Texas or the United States of America." Sheriff Civil Service Regulations, Rule 1.03 CONFLICT OF LAW. This would include an employee's rights to due process as conferred through state laws

establishing civil service for counties. Additionally, the ruling is arbitrary and an abuse of discretion. The right of the Appellant to due process and the right to a fair and impartial hearing were violated when the Civil Service Commission instilled an arbitrary time limit on William Perry's proceedings which prevented Mr. Perry from refuting all allegations made against him. Civil Service refusal to appropriately extend the time limit in this case infringed on his due process rights under the law.

### 1.    The time constraint imposed violated Mr. Perry's due process rights

As a public employee with a property right in his employment, the Appellant is entitled to due process. "A 'for cause' limitation on dismissal of a public employee creates an individual entitlement to continued employment that is considered a protected property right for purposes of the Due Process Clause." *County of Dallas v. Wiland*, 216 S.W.3d 344, 352 (Tex. 2007). Due process includes post-termination administrative procedures. See *Loudermill v. Cleveland Bd of Educ.*, 470 U.S. 532 (1985). Due process at a minimum requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge*, 424 U.S. 319, 333, (1976); *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex.2001); *Texas Workers' Comp. Comm'n v. Patient Advocs. of Texas*, 136 S.W.3d 643, 658 (Tex. 2004). The court should determine what process is due based upon the practical requirements of the circumstances. *Johnson v. Paxton*, No. 02-22-00459-CV, 2023 WL 5115303, at *4 (Tex. App. Aug. 10, 2023) (citing *Eldridge*, 424 U.S. at 334); *In re D.W.*, 498 S.W.3d 100, 112 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Three factors are weighed: (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of the private interest due to the procedures used. *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex. 2003) (citing *Eldridge*, 424 U.S. at 335).

The imposition of severe time limits—and any exclusion of evidence resulting therefrom—are reviewed under an abuse-of-discretion standard. *Johnson v. Paxton*, No. 02-22-00459-CV, 2023 WL 5115303, at *4 (Tex. App. Aug. 10, 2023). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). Erroneous exclusion of evidence is reversible only if it probably resulted in an improper judgment or probably prevented the appellant from properly presenting his case to the appellate court. *See* Tex. R. App. P. 44.1(a); *Monsanto Co. v. Davis*, 25 S.W.3d 773, 786 (Tex. App.—Waco 2000, pet. denied).

In this case, the severe time limit imposed on the hearing substantially prejudiced Mr. Perry who had a protected due process right to testify in order to refute each of the forty-six allegations made against him using his testimony along with fifty-four exhibits. He was irreparably harmed by this severe time constraint and was prevented from fully establishing his case due to the constraints. By allowing Mr. Perry only eleven minutes to testify on all forty-six allegations, he did not have sufficient time to present his evidence to the Commission as to how and why the allegations against him were inconsistent and false, which would have been beneficial in their deliberations.

**2. The Commission Violated State Law**

The Sheriff's Civil Service Commission of Harris County was created statutorily to be **an independent and neutral body** in order to ensure that Sheriff employees are not subject to unjustified terminations and discipline based on private vendettas or political whims, but the legislature created a for cause standard for the discipline of nonexempted employees. The rules adopted by the Harris County Civil Service Commission state:

> a. PURPOSE: These rules are prescribed for the purpose of promoting professionalism in law enforcement and assuring all employees in the

classified service of the Harris County Sheriff's Department of fair and impartial treatment at all times subject to Civil Service and Departmental standards and appeal rights as set forth in these rules.

*Civil Service Regulations*, Rule 1: Authority, Amendment, pg. 1. https://civilserv.harriscountytx.gov/Documents/CSREGSAmendmentsRule1.pdf

By the Civil Service Commission upholding an appealed discipline imposed by the Sheriff without hearing all the evidence, the Commission has jeopardized its designed impartiality by becoming a rubber stamp for the Sheriff.

**3. The ruling was not supported by the evidence**

The substantial evidence standard requires more than a "mere scintilla of evidence" to support the Commission's findings to uphold Mr. Perry's termination. The record will show that the parts of the case that Mr. Perry did have time to address, he was able to provide sufficient facts to refute the allegations made by colleagues. Mr. Perry was prevented from disputing the allegations made that were only based improperly on witness opinion or hearsay rumors rather than facts; however, by disputing all the fact-based evidence presented by his accusers, he was able to negate the allegations that claimed to support just cause needed by the Sheriff's Office to terminate him. HCSO could not demonstrate just cause for termination.

A district court has reversed a Civil Service Commission ruling for lack of evidence. In *City of San Antonio v. Flores*, the district court reversed the Civil Service ruling by stating that there was no substantial evidence to support the discipline upheld by the Commission and the reversal was upheld by the Appellate Court. In that case, Flores was terminated for leaving his home while on sick leave and for violations of the Department's morality policy. On both counts, the district court found that there was not substantial evidence to uphold the termination. The Department did present evidence for the termination, but all of its evidence was easily contradicted

and was found contrary to department policy.  In this case, Mr. Perry presented fifty-four exhibits that show that each of the allegations against Perry were refutable and not based on facts. The evidence the Commissioner's did hear from HCSO and its witnesses did not support or justify the just cause standard needed for termination. In many instances, the testimony given by the HCSO witnesses was easily refuted by the limited evidence able to be presented by Mr. Perry. The majority of the testimony presented by HCSO, relied on personal opinions regarding Mr. Perry's character that could not be grounds for termination from the Sheriff's Office. Had the Commission had allowed Mr. Perry the appropriate amount of time in order to present his evidence, the Commission would have had the full picture of the controversy and been able to make a decision that was unbiased based on facts not conjecture of personal or biased opinion.

## E.  CONCLUSION

The hearing held for the appeal of William Perry did not uphold the standards of due process as derived from the Tex. Local Gov't Code 158, the Constitution of the State of Texas, or the basic rights afforded citizens under the U.S. Constitution as applied to the states under the 14th Amendment. These provisions give legal authority for Harris County Sheriff employees to have post disciplinary review hearings in order to protect their property rights in their continuation of employment.

The decision of the Civil Service Commissioners must be reversed, and William Perry should be awarded a reversal of his termination as well as back pay. Reversing the decision is proper because (1) the Commission committed at least one of the errors listed in section 158.0121, specifically the Commission stymied Mr. Perry's due process rights by imposing an arbitrary time limit that prevented Mr. Perry from properly defending himself before the Commission; (2) a

substantial right of the petitioner was implicated, namely his right to an impartial hearing and due process; and (3) that right was prejudiced by the error by him not receiving a fair hearing and his discipline remaining in effect. For these reasons, and the other reasons outlined above, the decision of the Commission must be reversed.

### F.  PRAYER

The Appellant prays that after reviewing the record of the hearing, and comparing the facts with the law, the Court will reverse and render the decision of the Harris County Sheriff's Civil Service Commission and issue an order overturning William Perry's termination and restore his loss of pay, benefits, and seniority, because there was no rational basis for the Commission's decision. In the alternative, the Appellant prays the Court will preside over a hearing where the Appellant may present evidence of the Commission's violation of statutory law and its own regulations notwithstanding the failure to protect the constitutional proscriptions provided to the employees.

Respectfully submitted,

_David J. Batton /s/_
David J. Batton
Texas Bar No. 24124813
Robin M. Foster
Texas Bar No. 24072992
robin@hcdo.com
3130 N. Fwy
Houston, Texas 77009
P: (713) 659-0005
Attorneys for William Perry

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served to the Harris County Sheriff's Civil Service Commission and Harris County.

*/s/ David J Batton /s/*
David J. Batton

## VERIFICATION

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

BEFORE ME, the undersigned Notary Public, on this day personally appeared William Perry, known to me to be the person whose name is subscribed below on this verification and being by me duly sworn, states:

1.  that he is over 21 years of age, has never been convicted of a felony and is otherwise fully competent to make this statement; and

2.  that the facts asserted in the foregoing petition for appealing the decision of the Harris County Sheriff's Civil Service Commission accurately recount his communication and contact with the Respondents, who are members of the Harris County Sheriff's Civil Service Commission, and his personal knowledge is derived from personal participation involvement and witnessing the facts described in the Petition. The facts in the Petition are true and correct.

_____
WILLIAM PERRY

Sworn to and subscribed before me, by WILLIAM PERRY on this 29th day of November 2023.



SHILOH N. SPRADLIN
My Notary ID # 130280042
Expires August 5, 2027

_____
NOTARY PUBLIC